HALOCARBON PRODUCTS CORP., PLAINTIFF, v. BOROUGH OF
SOUTH RIVER, DEFENDANT.

Tax Court of New Jersey

May 9, 1980.

*Michael S. Richmond, Golden, Shore, Zahn & Richmond* for plaintiff.

*Gary M. Schwartz, Schwartz & Schiappa* for defendant.

ANDREW, J. T. C.

Plaintiff, taxpayer, seeks a reduction of the assessments on three contiguous parcels of vacant land for the tax years 1975 and 1979. The original assessments for the tax years 1975 and 1979 were as follows:

| 1975 | | 1979 | |
|---|---|---|---|
| Lot 1, Block 373 | $111,400 | Lot 1, Block 373 | $ 66,900 |
| Lot 1, Block 374 | $ 34,200 | Lot 1, Block 374 | $ 20,700 |
| Lot 1, Block 375 | $203,000 | Lot 1, Block 375 | $123,600 |

The Middlesex County Board of Taxation entered judgments as follows for each of the tax years:

| 1975 | | 1979 | |
|---|---|---|---|
| Lot 1, Block 373 | $ 66,900 | Lot 1, Block 373 | $ 66,900 |
| Lot 1, Block 374 | $ 20,700 | Lot 1, Block 374 | $ 20,700 |
| Lot 1, Block 375 | $123,600 | Lot 1, Block 375 | $123,600 |

The plaintiff filed a petition to the Division of Tax Appeals seeking a further reduction from the judgment of the Middlesex County Board of Taxation for the year 1975 and a complaint with the Tax Court seeking a reduction for the tax year 1979. There were no appeals filed for the tax years 1976, 1977 and 1978.

The total area of the three lots involved in this proceeding is 37.7 acres. The three parcels lie along the west bank of the South River in the Borough of South River, New Jersey. The property is bounded on the east by the South River and on the north and south by lands owned by Marcus S. Wright, Inc., and on the west by a 66 foot wide strip of land owned by the Raritan River Railroad Company. The land is undeveloped with a growth of trees and shrubs on the greater portion and some marsh land near the river itself. The land slopes gently toward

the river from the land owned by the Raritan River Railroad Company. A survey and a tax map adduced in evidence indicate that the property is landlocked unless an easement or license exists permitting the plaintiff to cross the land owned by the Raritan River Railroad Company at Bisset Street, Kathryn Street, or through the rear of Lot 1, Block 369 which lot was purchased by the plaintiff in March of 1975.

The subject property is located in an H–I heavy industrial district in accordance with the 1972 revised zoning ordinance of the Borough of South River. The heavy industrial district provides for most industrial manufacturing uses. However, it must be noted that in accordance with the provisions of *N.J.S.A.* 58:16A–50 the Department of Environmental Protection was given the power to delineate flood hazard areas and to adopt rules regulating the development and use of such areas. Certain portions of the subject property are situated in the floodway area of the South River. Some portions are located in the flood fringe area of the South River and the remaining portions are unrestricted by regulation.

The pertinent regulations prohibit the use of the property located in the floodway for all practical purposes. *N.J.A.C.* 7:13–1.4. Lands within a flood fringe area can be utilized but the property owner must first secure the approval of the Department of Environmental Protection. *N.J.S.A.* 58:1–26.

The taxpayer acquired title to the subject property on April 17, 1973 for a consideration of $93,546.20. This price was arrived at in accordance with the agreement for sale which provided as follows:

"The purchase price for said real estate will be Three Thousand Eight Hundred Dollars and no cents ($3,800.00) per acre for all of the land on the west side of South River above the mean high water line upon which the State of New Jersey does not assert or will effectively release any claim of ownership. For all other land owned or subject to claim by seller, i. e. land below the mean high water line or under the water, or on the east side of South River and land upon which the State of New Jersey will not effectively release any claim, the price will be One Dollar ($1.00) per acre." (Exhibit P–8)

The plaintiff produced a survey which indicated that the gross acreage was 37.7 acres; the land below the mean high water line

was 13.086 acres and the land above the mean high water line was 24.614 acres. The parties allocated $13.00 for the property below the mean high water line (13.086 × $1.00 per acre) and $93,533.20 for the acreage above the mean high water line. (24.614 at $3,800 per acre). The statement of closing title (exhibit P–7) indicated on page 6 that the purchaser understood

"that it had no present easement or title giving it access by land to the property. The title report indicates the purchaser would have the right to a railroad crossing coming on to the property if access to the far side of such railroad crossing can be obtained. At the time of closing, it was purchaser's belief that as a practical matter it would be able to obtain such access on acceptable terms either through lands of third parties or through Bisset Place."

The taxpayer's appraisal expert indicated that although there were three approaches to value the only approach utilized by him in his appraisal was that of the market data or sales comparison approach. He opined that this was the only suitable approach to value in this matter. In relying on the market data approach the taxpayer's expert stated that there were no sales of comparable vacant land within the taxing district which were located in a flood hazard area, landlocked, and crossed by numerous drainage ditches as was the subject. He did, however, review three sales. Initially, he considered the sale of the subject property itself. As previously stated, this sale took place on April 17, 1973 and the consideration was $93,546.20 for 37.7 acres of vacant land. It was his opinion that the sale of the subject was an arms–length transaction and was the most persuasive of the three sales that he reviewed.

The second sale that the taxpayer's expert considered was that of Block 369, Lot 1, which contained 2.5 acres of land. This was a sale by W. W. Henry Company to the plaintiff, Halocarbon Products Corporation, on March 31, 1975. This sale indicated an approximate value of $12,000 per acre. However, it was the appraiser's opinion that this sale did not represent the market value because the sale was not between a willing buyer and willing seller. He indicated that the buyer had to buy this particular piece of property in order to gain access to the previously purchased landlocked parcels which were the subject of this proceeding. For this reason, he did not consider it an

arms–length transaction. Therefore, he ignored the sale. I find the sale lacks comparability for reasons to be hereinafter stated.

The third sale utilized by the taxpayer's expert was that of a parcel on 130 Williams Street which was only 1.65 acres in size. I find that this sale lacks comparability on size alone.

Considering all of the sales the expert gave the greatest weight to the sale of the subject property in April, 1973 and arrived at an overall value for all three parcels of $97,000. His allocation was as follows:

| | |
|---|---|
| Block 373, Lot 1 | $36,800 |
| Block 374, Lot 1 | $11,700 |
| Block 375, Lot 1 | $48,500 |

These estimates of value were based on his opinion that the fair market value of the subject properties both for October 1, 1974 and October 1, 1978 was $3,800 per acre for that land which was above the mean high water line and $1.00 per acre for that land which was below the mean high water line. In effect, he adopted the method by which the parties to the sale determined the purchase price for the subject property in April, 1973. It should be noted that the taxpayer's expert did not differentiate between those lands that were in the flood fringe area and those lands which were in the unrestricted area. He attributed a value overall for all lands above the mean high water line even though some lands above the mean high water line were in the flood fringe area.

The defendant produced a borough engineer who indicated that relative to the flood hazard maps the total acreage of 37.7 acres was allocated as follows: 8.2 acres were located in the floodway, 16.3 acres were located in the flood fringe area and 13.2 acres were located in the unrestricted area. The engineer indicated that construction was prohibited on the property located within the floodway with certain minor exceptions and that construction was permissible within the flood fringe area provided the necessary governmental approvals were obtained. His computations by lot were as follows: Block 373, Lot 1, 31% floodway; 58.3% flood fringe area; 10.7 unrestricted. Block 374, Lot 1, 10.3% floodway; 38.5% flood fringe area; 51.2%

unrestricted. Block 375, Lot 1, 19.6% floodway; 37.4% flood fringe area; 43% unrestricted.

The taxing district then presented an appraiser who indicated, as did the taxpayer's expert, that the only usable method in an appraisal of the subject property was the market data approach. He indicated that he relied on four sales to arrive at his estimate of value. The first sale was Block 377, Lot 1, which is a parcel adjacent to the subject properties on the south. This sale occurred on September 1, 1968. The price was $45,000 and the land area was 8.4 acres giving rise to a price per acre of $5,357. He indicated that the deed transferring the title to Block 377, Lot 1, also included a right–of–way across the Raritan River Railroad Company land. He adjusted the price per acre by allowing an inflation factor of 8% per year to adjust for time since the comparable sale took place on September 1, 1968 and the first assessment date with which he was concerned was October 1, 1974. He therefore calculated an inflation factor of 48% added to the estimated price per acre giving an indicated value per acre of $7,928.

The second sale indicated by the taxing district's expert was that of Block 368, Lot 1, which took place on May 31, 1974. The sales price was $50,000 and the size of the lot was 5.25 acres giving rise to a price per acre of $9,524. This parcel has 484 feet of frontage on Whitehead Avenue, a county road in the Borough of South River. The comparable was not affected by flood hazard area regulations.

The third sale testified to by the expert for the taxing district was that of Block 369, Lot 1, which was the sale by W. W. Henry Company to the plaintiff, Halocarbon Products Corporation on March 31, 1975 for a consideration of $30,000. This property also fronts on Whitehead Avenue and is not affected by flood hazard area regulations. This was the sale which was discounted by the taxpayer's expert as not being an arms–length transaction because the plaintiff required this particular parcel in order to give it access to Whitehead Avenue. The taxing district's expert also felt that the buyer may have been

under some compulsion to purchase this property in order to give it access to the subject property, however, he did not feel that the compulsion was such that it impelled him to disregard the sale entirely. He felt that this factor called for a 15–20% adjustment in order to make the sale property comparable to the subject. It was his opinion that this would give an indicated value to the sale property of $10,000 per acre.

The fourth and final sale which was reviewed by the taxing district's expert was that of the subject property. He disregarded this particular sale because in his opinion it was tainted. He based his determination on the following factors: (1) the seller was an out of state corporation; (2) the seller was in financial difficulty; (3) the sales price was an odd amount.

It was his opinion that the land area located in the floodway had a value of $100 per acre; that the land located within the flood fringe area had a value of $7,125 per acre and that the land located in the unrestricted area had a value of $9,500 per acre. In regard to the property located within the floodway itself it was his opinion that a value of $100 per acre was proper even though he could not indicate any basis for attributing a value of $100 per acre for land which he conceded was nonusable. His final value determination was as follows:

| | |
|---|---|
| Block 373, Lot 1 | $ 53,500 |
| Block 374, Lot 1 | $ 29,700 |
| Block 375, Lot 1 | $159,100 |

The taxing district's expert indicated that the values for the tax years of 1975 and 1979 would be the same since there was no change during the four year period which would affect the value of the land.

In an analysis of the taxing district's expert's testimony, I find that the sales relied upon by him in arriving at his value estimate are not comparable to the property in question. The first sale that he relied upon was Block 377, Lot 1. It was established on cross–examination that this particular sale included improvements within the sale price. The expert did not know the extent of the improvements. It was also shown that

the flood hazard regulations were not in effect at the time of the sale. He further indicated that his 8% inflation factor was based on his experience alone. There was no other basis in fact for the 8% per year adjustment for time. It was also shown that this particular sale involved a parcel of land substantially smaller than the subject. (8.4 acres as to 37.7 for the subject)

The second sale involved property fronting on Whitehead Avenue, a county road, which was also substantially smaller than the subject (5.25 acres) and was not affected in any way by the flood hazard regulations.

Sale No. 3 involved a parcel which also fronted on Whitehead Avenue; was substantially smaller than the subject property (2.5 acres) and involved a purchaser who had an economic compulsion to purchase the property. This latter point was conceded by the taxing district's expert when he allowed a 15–20% premium because he felt that the purchaser would pay that much more in order to obtain the particular property.

I find that the most persuasive sale was that of the subject property. The Court is aware that true value is not always ascertained by reference to the sale price of the subject premises. *Harborside Warehouse Co., Inc. v. Jersey City* 128 *N.J.L.* 263, 265, 25 *A.2d* 291 (Sup.Ct.1942), affirmed 129 *N.J.L.* 62, 28 *A.2d* 91 (E. & A.1942), *cert.* den. 318 *U.S.* 769, 63 *S.Ct.* 763, 87 *L.Ed.* 1140 (1942). It has been determined that the selling price of real property is a guiding indicium of fair value but it is merely evidential. *Rek Investment Co. v. Newark*, 80 *N.J.Super.* 552, 194 *A.2d* 368 (App.Div.1963). However, the selling price might become controlling subject to the limitation that the determination properly involve the weighing and appraising of all component factors and adventitious circumstances. *L. Bamberger & Co. v. Division of Tax Appeals*, 1 *N.J.* 151, 62 *A.2d* 389 (1948).

The taxing district's expert stated that he ignored this particular sale because it was tainted. He felt that the fact that the seller was an out of state corporation would affect the sale. It is difficult for this Court to understand why the principal

location of the seller in and of itself would affect the weight to be given to a particular sale. The municipality's expert also concluded that the seller was in financial difficulty, however, he never demonstrated a basis for this conclusion. He also indicated that the odd amount involved in this sale played a large part in his determination that it was not an arms–length transaction. On cross–examination, after an explanation as to the method by which the parties arrived at the determination of the purchase price, he admitted that he would have given greater weight to the sale than he did in his appraisal. I find that there is nothing to indicate that the sale of the subject property on April 17, 1973 was not an arms–length transaction. Both the statement of closing title and the contract of sale indicated the method by which the parties arrived at the purchase price. The fact that the seller was an out of state corporation does not *ipso facto* affect the sales price. The statement that the seller was in financial difficulty was not supported by any proof other than the assertion of the taxing district's expert.

I find that I need not make a determination as to whether or not the property in question is landlocked. It should be noted, however, that the proofs with regard to whether the property is landlocked were vague and incomplete. I find that the purchaser of the subject property did not give a great deal of consideration to the question of whether the property was landlocked. As previously indicated, the statement of closing title provided that it was the purchaser's belief that as a practical matter the purchaser would be able to obtain access upon acceptable terms either through lands of third parties or Bisset Place. I, therefore, do not believe that the question of landlocked property entered into the determination of price by either the seller or the purchaser.

I do believe, however, that the issue of questionable title did enter into the calculation of the sales price. This can be gleaned from the contract of sale and the settlement statement. In each document there is an indication that the parties con-

, sidered the outstanding claims of the State of New Jersey and that this played a part in their determination that some land was worth only $1.00 per acre.

█ This portion of the sales price is not entitled to evidential weight in the ascertainment of what a willing buyer would pay a willing seller for all interests in a particular parcel of land. *Secaucus v. Damsil, Inc.*, 120 *N.J.Super.* 470, 295 *A.2d* 8 (App. Div.1972). In *Secaucus* it was indicated that the law requires an assessment of the value of the land, not the value of the owner's title. This question of title, however, would not affect valuation. Therefore, this Court will apply a value of $3,800 per acre for each acre of land not located in a floodway and the value of $1.00 per acre for each acre of land located in the floodway. The value attributed to the floodway land is based on the fact that for all practical purposes the land is not usable. This Court cannot ignore the impact that flood hazard regulations have upon the value of real property. *N.J.S.A.* 58:16A–60; *Cappture Realty Corp. v. Elmwood Park*, 126 *N.J.Super.* 200, 313 *A.2d* 624 (Law Div.1973), aff'd 133 *N.J.Super.* 216, 336 *A.2d* 30 (App.Div. 1975); *N.J. Bldrs. v. Dept. of Environmental Protection*, 169 *N.J.Super.* 76, 404 *A.2d* 320 (App.Div.1979).

I will accept the computations as submitted by the borough engineer as to those portions of each of the particular lots which lie within the floodway and are unusable for all practical purposes. This will produce the following rounded values.

| | |
|---|---|
| Lot 1, Block 373 | $35,900 |
| Lot 1, Block 374 | $11,600 |
| Lot 1, Block 375 | $63,000 |

I find these values to exist for both the tax years of 1975 and 1979 as I do not find, based on the testimony of the two appraisal experts, that the values increased between the two assessing dates.

Judgment shall be entered accordingly by the Clerk of the Tax Court.